ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Ology Bioservices, Inc. | ) ASBCA No. 62633 |
| | ) |
| Under Contract No. W911QY-13-C-0010 | ) |
| *et al.* | ) |

APPEARANCES FOR THE APPELLANT:    Richard B. O'Keeffe Jr., Esq.
        Gary S. Ward, Esq.
        Nicole E. Giles, Esq.
         Wiley Rein LLP
         Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Arthur M. Taylor, Esq.
         Chief Trial Attorney
        Patrick B. Grant, Esq.
         Trial Attorney
         Defense Contract Management Agency
         Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal involves a penalty for expressly unallowable costs, namely, executive compensation costs above the threshold established by the Office of Federal Procurement Policy (OFPP). The parties have cross-moved for summary judgment. The Board grants appellant's motion and denies the government's cross-motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

The following facts are undisputed for purposes of the motions.

Between 2011 and 2013, appellant, Ology Bioservices, Inc. (Ology) entered into four cost reimbursement contracts with the government, including the contract referenced above. A Defense Contract Management Agency (DCMA) contracting officer (CO) was responsible for negotiating and establishing Ology's final indirect cost rates for the contracts. (Appellant's statement of undisputed facts (ASUMF) ¶¶ 3-4; Government statement of genuine issues of material fact (GSMF) ¶¶ 3-4; R4, tab 8).

The contracts included FAR 52.242-3, PENALTIES FOR UNALLOWABLE COSTS (MAY 2001), which provides for the assessment of a penalty for costs submitted by the contractor in its proposal that are "expressly unallowable under cost principle in the FAR . . . ." (FAR 52.242-3(d); ASUMF ¶¶ 5, 20; R4, tab 1 at G-000099). The contracts also included FAR 52.242-4, CERTIFICATION OF FINAL INDIRECT COSTS (JAN 1997), which requires a senior official of the contractor to certify, among other things, that the final indirect cost rates do not include any costs that are expressly unallowable under applicable cost principles of the FAR (ASUMF ¶ 5; R4, tab 1 at G-000099; FAR 52.242-4(c)(2)).

The dispute involves compensation to Ology's chief executive officer (CEO). More specifically, it involves his salary, bonuses and stock option awards valued at $2,730,686. Most of this amount stems from stock option awards valued at $2,253,986 (GSMF ¶¶ 32-41; R4, tab 2 at G-0000160).

The contract referenced above included FAR 52.216-7, ALLOWABLE COST AND PAYMENT (JUN 2011) (R4, tab 1 at G-000102-03). This clause required Ology to submit its final indirect cost rate proposal within six months after the end of its fiscal year, which for Ology was the calendar year. FAR 52.216-7(d)(2). Ology complied with the clause by submitting its FY 2013 proposal on June 30, 2014. After addressing issues identified by the Defense Contract Audit Agency (DCAA), it submitted a revised proposal on December 18, 2014 (ASUMF ¶¶ 6, 22-23; GSMF ¶¶ 6, 22-23).

After a DCAA audit and a lengthy negotiation period between the parties (ASUMF ¶¶ 25-30; GSMF ¶¶ 25-30), the CO issued a final decision on May 13, 2020. Based on an FY 2013 cap for executive compensation of $980,796, the CO determined that Ology had exceeded the cap and included expressly unallowable costs of $1,749,890[1] for its CEO in its indirect cost rate proposal. The CO found that $979,938 of this amount was allocated to covered contracts and assessed Ology a penalty in this amount. In addition, she demanded interest that brought the total government claim to $1,109,160 (ASUMF ¶¶ 1, 26, 31; GSMF ¶¶ 1, 26, 31).

DECISION

I.     *Summary Judgment Standards*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a motion for summary judgment, the Board must determine whether there is a genuine for

---

[1] $2,730,686 - $980,796 = $1,749,890

trial.  *Id.* at 249.  The mere fact that the parties have cross-moved for summary judgment does not require us to grant one of the motions; each must be independently assessed on its own merit.  *California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) (citing *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1364 (Fed. Cir. 2001)).

II.  *Relevant Statutes and Regulations Concerning Executive Compensation Costs*

As stated above, the contracts included FAR 52.242-3, PENALTIES FOR UNALLOWABLE COSTS (MAY 2011), and FAR 52.242-4, CERTIFICATION OF FINAL INDIRECT COSTS (JAN 1997).  These clauses implement statutory and regulatory requirements.

At all times relevant to this dispute, 10 U.S.C. § 2324 provided that:

> If the head of the agency determines that a cost submitted by a contractor in its proposal for settlement is expressly unallowable under a cost principle referred to in [the FAR] that defines the allowability of specific selected costs, the head of the agency shall assess a penalty against the contractor. . .

10 U.S.C. § 2324(b)(1); *Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1312 (Fed. Cir. 2019).

FAR 31.001 defines an "[e]xpressly unallowable cost" as "a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable."  "The government bears the burden of proving that costs are expressly unallowable and that a penalty assessment was warranted."  *Raytheon*, 940 F.3d at 1311.

Title 10, Section 2324, identifies specific costs that are unallowable.  In 2013, the statute prohibited the reimbursement of employee compensation costs above a benchmark (or cap) established by the Administrator of the OFPP pursuant to 41 U.S.C. § 1127.  10 U.S.C. § 2324(e)(1)(P).  Compensation is defined as "the total amount of wages, salary, bonuses, and deferred compensation for the fiscal year, whether paid, earned, or otherwise accruing, as recorded in an employer's cost accounting records for the fiscal year."  41 U.S.C. § 1127(a)(3).

OFPP published the cap in the Federal Register.  The caps most relevant to this appeal are those for FY 2012 and FY 2013.  OFPP published the cap for FY 2012 on December 4, 2013, in the amount of $952,308.  OFPP provided that this "amount applies to limit the costs of compensation for contractor employees that are reimbursed

3

by the Government to the contractor for costs incurred on all contracts, after January 1, 2012 <u>and in subsequent contractor FYs, unless and until revised by OFPP</u>." Determination of Benchmark Compensation Amount for Certain Executives and Employees, 78 Fed. Reg. 72,930 (Dec. 4, 2013) (emphasis added). This was the most recent cap when Ology submitted its revised indirect cost rate proposal on December 18, 2014.

OFPP subsequently published a FY 2013 cap of $980,796, but did not do so until March 15, 2016. The cap applied to costs incurred from January 1 to December 31, 2013. Determination of Statutory Formula Benchmark Compensation Amount for Certain Executives and Contractor Employees, 81 Fed. Reg. 13,833 (Mar. 15, 2016). The government has not provided any explanation as to why there was such a delay in establishing the FY 2013 cap.

III.    *The Government Cannot Apply the FY 2012 Cap to FY 2013*

A.    *Issues Pending Before the Board*

Before the Board addresses what we believe is the very narrow issue before us, we identify what is *not* before us.

First, Ology does not dispute that executive compensation costs above the FY 2013 threshold are unallowable (app. reply br. at 16, 20). Thus, the government will not have to reimburse Ology for amounts above the cap. Ology challenges only the penalty.

Second, as described above, the FY 2012 cap was $952,308. Ology does not (and could not) argue that it had a good faith belief that the cap would rise nearly 200% when it paid compensation to its CEO of more than $2.7 million in 2013.

Third, on the government side, DCMA does not contend that changes in executive compensations costs were *de minimis*, making it reasonable for OFPP to leave the FY 2012 cap in place until March 2016. Quite the opposite, when OFPP set the FY 2012 cap it complained about rapidly escalating compensation costs and observed that the cap had increased by 55% from FY 2008 to FY 2012. 78 Fed. Reg. at 72,931.

Finally, DCMA does not defend the CO's position that she could assess a penalty based on a cap that was not promulgated until almost 15 months after Ology submitted its revised final proposal. Rather, it contends that the FY 2012 cap remained binding in December 2014 when Ology submitted its revised final proposal. (Gov't motion at 16-21; gov't reply at 6-7).

4

Ology contends that this deprives the Board of jurisdiction because the government is now pursuing a new claim. The Board may not consider claims not presented to the CO. *Lee's Ford Dock, Inc. v. Sec'y of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017). "A claim is new when it 'presents a materially different factual or legal theory' of relief." *Id.* (quoting *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015)). However, the Federal Circuit has held that a contractor in litigation may pursue a claim posing "slightly different legal theories." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1366 (Fed. Cir. 2003). In *Scott Timber*, the contractor in its claim challenged the authority of the Forest Service to suspend its contracts and the reasonableness and duration of those suspensions. At the Court of Federal Claims, it added: 1) contentions that a particular contract clause contained a warranty; 2) objections to the agency's preparation and administration of the contract; and 3) claims for reimbursement provided under contract terms. The Federal Circuit held that this was permissible because the claims pursued in court were based on the same operative facts and continued to seek consequential damages for an alleged breach of contract. *Id.* at 1365-66.

The Board holds that we possess jurisdiction to consider the government's contentions based on the FY 2012 cap. The claim presented in this appeal is based on the same operative facts concerning the CEO pay, the same contract clauses, and the same legal theory involving a penalty for expressly unallowable executive pay established by OFPP under 10 U.S.C. § 2324 and 41 U.S.C. § 1127. While it is true that the government has shifted from an FY 2013 to an FY 2012 cap argument, this is permitted because it has stayed within the same umbrella of facts and legal theories upon which the CO based her decision. *Scott Timber*, 333 F.3d at 1365-66.

B.     *The FY 2012 Cap Cannot Be Applied to FY 2013 Costs*

Having thus defined the dispute, the issue before the Board is simply whether DCMA can assess a penalty against Ology by applying the FY 2012 cap to Ology's FY 2013 proposal. We hold that it cannot.

Returning to 10 U.S.C. § 2324, in 2013 this statute provided in relevant part:

> (e) Specific costs not allowable.—
>
> (1) The following costs are not allowable under a covered contract: . . .
>
> (P) Costs of compensation . . . to the extent that such compensation exceeds the benchmark compensation amount determined applicable <u>for the fiscal year</u> by the

5

Administrator for Federal Procurement Policy under section 1127 of title 41 . . . .

(Emphasis added).

Title 41, Section 1127, in turn, provided:

(a) Definitions.--In this section:

(1) Benchmark compensation amount.--The term "benchmark compensation amount", for a fiscal year, is the median amount of the compensation provided for all senior executives of all benchmark corporations for the most recent year for which data is available at the time the determination under subsection (b) is made.

(2) Benchmark corporation.--The term "benchmark corporation", with respect to a fiscal year, means a publicly-owned United States corporation that has annual sales in excess of $50,000,000 for the fiscal year.

. . .

(b) Determining benchmark compensation amount.--For purposes of . . . section 2324(e)(1)(P) of title 10, the Administrator shall review commercially available surveys of executive compensation and, on the basis of the results of the review, determine a benchmark compensation amount to apply for each fiscal year. In making determinations under this subsection, the Administrator shall consult with the Director of the Defense Contract Audit Agency and other officials of executive agencies . . .

(Emphasis added).[2]

---

[2] The statute also defined "fiscal year" to mean the contractor fiscal year, 41 U.S.C. § 1127(a)(4) but Ology used the calendar year for its fiscal year and OFPP effectively used a calendar year system. For the FY 2012 cap, OFPP stated that the cap applied to "costs incurred on all contracts, after January 1, 2012 . . ." 78 Fed. Reg. 72,930.

OFPP understood the direction in Section 1127(b) to set a cap "for each fiscal year" as a direction to revise the cap on an annual basis. From 1998[3] to 2010, OFPP established the cap sometime between February and May of the year in question, so that it was in place by the time Ology would have had to certify its proposal (*see* app. reply br. at 14-15 (listing dates); gov't reply br. at 12-13). For example, on April 15, 2010, OFPP set the FY 2010 cap at $693,951. Determination of Benchmark Compensation Amount for Certain Executives, 75 Fed. Reg. 19,661 (Apr. 15, 2010). But in the years that followed, the date that OFPP set the cap grew later and later. OFPP set the FY 2011 cap on April 23, 2012, Determination of Benchmark Compensation Amount for Certain Executives, 77 Fed. Reg. 24,226 (Apr. 23, 2012), and, as described above, it set the FY 2012 cap of $952,308 on December 4, 2013, 78 Fed. Reg. 72,930, and the FY 2013 cap of $980,796 (as well as the FY 2014 cap of $1,144,888) on March 15, 2016, 81 Fed. Reg. 13,833.

While the date on which OFPP set the cap grew later, it continued to recognize that it must reset the cap each year. OFPP stated when setting the FY 2012 cap that it was "compelled by statute to raise the cap for another year. . ." 78 Fed. Reg. 72,930. OFPP further stated that it had "no flexibility to depart from the statutory requirement that the cap be <u>adjusted annually</u> based on the application of the statutorily-mandated formula." *Id.* at 72,931 (emphasis added).

The Board agrees that Section 1127 required OFPP to set a new cap each year. Congress communicated this through the directives to set a cap "for each fiscal year" and to base it upon "the most recent year for which data [of executive compensation at specified publicly held corporations] is available. . ." 41 U.S.C. § 1127 (a)(1), (b). Congress reinforced the message that this should be done annually by using the plural: "[i]n making <u>determinations</u> under this subsection, the Administrator shall consult with the Director of the Defense Contract Audit Agency. . ." *Id.* at § 1127(b) (emphasis added).

Neither the statute nor any FAR provision specified a date by which OFPP must establish the cap. While it is reasonable to infer that Congress granted OFPP some leeway as to when it would set the cap, we do not believe that Congress intended OFPP to have unlimited time to update the cap or for the government to apply an outdated cap for years on end. We draw this conclusion based on the statutory goals and existing regulatory requirements. The statute evinces a congressional intent that contractors performing cost reimbursable contracts be allowed to recover compensation costs up to (but not more than) the median of executive compensation at benchmark corporations, based on "the most recent year for which

---

[3] Section 808 of the 1998 National Defense Authorization Act for Fiscal Year 1998 established a cap on the "[c]osts of compensation of senior executives of contractors for a fiscal year. . ." Pub. L. No. 105-85, § 808.

data is available. . ." 41 U.S.C. § 1127(a)(1). To carry out this congressional objective, the cap would have to be kept relatively up to date, at least in an environment where executive compensation was escalating so rapidly.

Further, the government imposed on the contractor an obligation under the Allowable Cost and Payment clause to submit its final indirect rate cost proposal within six months of the end of its fiscal year, FAR 52.216-7(d)(2). The government required the contractor to certify at that time that the proposal did not include any expressly unallowable costs, FAR 52.242-4(c). To submit the proposal and make this certification, the contractor would have to know the cap for that year.

The government contends that OFPP met its statutory obligation because it stated that the 2012 cap would apply "after January 1, 2012 and in subsequent contractor FYs, unless and until revised by OFPP." 78 Fed. Reg. 72,930 (emphasis added). The Board disagrees. For the reasons stated above, the statute required OFPP to update the cap annually, and OFPP understood this because it revised the cap for each fiscal year.

While it is true that OFPP eventually met the statutory directive to establish an FY 2013 cap, it did so long after it would provide guidance to contractors, at least those who complied with their contracts by submitting timely indirect cost rate proposals. Applying the FY 2012 cap to 2013 compensation would have the odd effect of placing contractors who complied with their deadlines in a worse position than a contractor who waited until after the March 15, 2016 issuance of the FY 2013 cap to submit its proposal. The Board believes that Congress expected more of OFPP than a technical compliance with the statutory directive that was too late to be helpful.

OFPP stated when it set the FY 2013 cap that it was "applicable to compensation costs incurred on all covered contracts during the period of January 1, 2013 through December 31, 2013 for the contractor's fiscal year." 81 Fed. Reg. at 13,834. This dispute involves FY 2013 compensation and the FY 2013 would be the cap that applies, not the FY 2012 cap. The FY 2013 cap did not exist when Ology certified its FY 2013 indirect cost rate proposal and the government has, in any event, abandoned the argument that the FY 2013 cap could be applied retroactively to Ology's FY 2013 proposal.

Accordingly, there is no issue that requires a hearing. The government cannot carry its burden of demonstrating that Ology included expressly unallowable costs in its FY 2013 proposal and that a penalty was warranted. Ology is entitled to summary judgment that its FY 2013 executive compensation costs were not expressly unallowable at the time it certified its final indirect cost rate proposal because the FY 2012 cap was no longer applicable. The government's cross motion is denied.

CONCLUSION

For the foregoing reasons, Ology's motion for summary judgment is granted. The government's cross motion is denied.

Dated: May 20, 2021

_____
MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

_____
RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

_____
OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62633, Appeal of Ology Bioservices, Inc., rendered in conformance with the Board's Charter.

Dated: May 20, 2021

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

9